*373
 
 HIGGINS, Justice.
 

 This is a suit by a public carrier against a lumber company and its surety, in solido, to recover freight charges amounting to the sum of $10,652.40, representing the difference between the depressed transit rate collected by it on numerous shipments of inbound rough lumber and the normal non-transit rate alleged to be'due under the terms of four bonded “milling-in-transit” contracts entered into between the parties on September 29, 1922, April 1, 1925, July 1, 1925, and September 8, 1925, respectively.
 

 Plaintiff alleges that under the provisions of the agreements which were confected in accordance with the published tariff regulations of the Interstate and Intrastate Commerce Commissions, the lumber company was entitled to pay the depressed transit rate on the inbound rough lumber only on the condition that the lumber company would reship the finished product via the carrier’s lines within one year thereafter, at the full published tariff or commercial rates applicable from the mill at Alexandria, La., to the final destination, •otherwise the normal tariff rate would be ■due; that the lumber company failed to reship certain finished lumber within the year; and, that while other finished lumber was reshipped within that period of time over its lines, these shipments were •exempt from the payment of any freight under the tariffs, because the railway company purchased the materials for itself and hauled them for its own account, and, therefore, plaintiff is entitled to collect the full commercial rate on the previous inbound shipments of rough lumber, subject to a credit of the depressed transit rate already paid.
 

 The defendants answered admitting the execution of the contracts and bonds, but denied liability, and averred that the plaintiff wrongfully refused to allow the defendants credit on the “milling-in-transit” account for the merchandise purchased by the plaintiff from the defendants and shipped over its railroad from Alexandria, La., to Marshall, Tex.; that plaintiff requested prices for the purchase of the lumber on the basis f. o. b. its rails Alexandria, La.; that the f. o. b. Alexandria prices quoted plaintiff were accepted and paid by the plaintiff and were the same prices charged all other buyers for lumber of similar quality and quantity f. o. b. Alexandria; that the lumber products were sold to the plaintiff at prices based on the low inbound depressed tariff rate on rough material, of which • fact the plaintiff’s representatives were apprised; that the various shipments of the finished product over the plaintiff’s lines were under the standard form or regular commercial bills of lading issued -by the plaintiff to the defendants and were not stamped “freight prepaid”; that, therefore, the said shipments were delivered to and accepted by the plaintiff on the basis of “freight charges collect” to the point of destination, in accordance with full published tariff rates; that plaintiff, having purchased the lumber at f. o. b. prices
 
 *375
 
 Alexandria, based upon the low inbound “milling-in-transit” rate on the rough materials, is indirectly attempting • in the present suit to reduce the purchase price paid by plaintiff to the extent of the difference between the normal commercial rate on the inbound rough materials and the depressed rate thereon; that plaintiff’s position is untenable, because it is attempting to violate the agreements that it entered into with the defendants in connection with each and every purchase of finished lumber during the last several years, and would have the effect of reducing the total amount of the purchase prices by the amount claimed in this suit; that plaintiff is endeavoring to interpret the tariffs and the contracts in such a way as to discriminate in its favor against other purchases of lumber at prices quoted f. o. b. railway cars Alexandria; that by virtue of the issuance of the commercial bills of lading on such shipments of outbound tonnage, the plaintiff is estopped from denying defendants credit on the transit account covering the shipments in question.
 

 There was judgment against the defendants, in solido, for the sum of $886.74, and plaintiff appealed.
 

 Defendants have not answered the appeal, and admit that the judgment of the lower court is correct.
 

 In order to give manufacturers the equivalent of through freight rates, the Interstate and Intrastate Commerce Commissions have authorized what are called “milling-in-transit” contracts. There are two modes of procedure under the tariffs by which a transit operator or manufacturer may avail himself of the “milling-in-transit” privileges. The manufacturer may pay the normal nontransit rate from origin of the rough material to the mill and thereafter secure a refund down to the depressed rate by making reshipments of the finished product via the rails of the same carrier within one year. The manufacturer is given the option of executing a contract and bond guaranteeing the observance of the requirements of the tariff, thereby securing, the right to have the rough materials delivered to him by the carrier upon the payment of the depressed nontransit rate. Under this arrangement he must also' reship the finished product over the contracting carrier’s lines within one year, at the full published tariff rates, otherwise he-must pay the full normal rate. The contract and bond arrangement gives the manufacturer the advantage of not having his. capital tied up in freight charges subject to rebate. The tariffs also allow in favor of the manufacturer a shrinkage of 25 per cent, between the rough and finished product. The transit operator or shipper mrtstkeep a record of all inbound rough material shipments and the outbound product shipments, and must permit the carrier to inspect his records.
 

 The plaintiff employed, in addition to its own auditors, the Western Weighing & Inspection Bureau to check the “milling-in-transit” accounts of its patrons.. During the latter part of 1922, the lumber company
 
 *377
 
 kept the account .and placed therein, as a credit, the outbound shipments of merchandise sold to the railway company f. o. b. its cars Alexandria. Some time later, the representatives of the Western Weighing & Inspection Bureau struck put these credits on the ground that the shipments of the lumber purchased by the carrier and hauled over its lines were not subject to freight charges. The defendants’ employee was then instructed by the representatives of the Western Weighing & Inspection Bureau not to enter such shipments as credits in the future. By eliminating these credits, the amount of the bond furnished in 1922 in the sum of $2,000 proved inadequate, and the plaintiff, exercising the right given it by the tariff, exacted an additional $2,000 bond, which was furnished on April 1, 1925. Due to the fact that the outbound shipments of the finished product at full published tariff rates to consignees, other than the railway company, were insufficient to offset the inbound shipments of rough materials, the railway company again on July 1, 1925, and September 8, 1925, called for additional bonds, which were furnished, making the total amount thereof $13,000.
 

 During April, 1927, the president of the lumber company discovered that credits were not being allowed for shipments of materials purchased by the railway company, and instructed the representative of the lumber company, who kept the transit account, to place these credits thereon, and protested to the plaintiff about disallowing them. While this controversy ■ was going on, plaintiff purchased lumber from the lumber company on a number of occasions under the same circumstances as it had before the dispute took place. Finally, efforts to settle the matter amicably were unavailing, and on September-25, 1930, plaintiff instituted the present suit to recover the freight claimed to be due on inbound shipments of rough materials during the period from April, 1923, to September, 1930.
 

 The evidence shows that the railway company purchased lumber upon competitive prices f. o. b. its rails; that the lumr ber company quoted to plaintiff, on that basis, prices which were predicated on the low or depressed tariff rate covering the shipments of the rough lumber; that plaintiff’s representatives were aware of this fact; that the f. o. b. prices quoted plaintiff were the same f. o. b. prices quoted to other purchasers or consignees, who paid the railway company the full tariff rate on the outbound shipments of finished lumber; that the price of lumber f. o. b. Marshall, Tex., or any other city would not alter the base price of the lumber at the mill, because the price f. o. b. destination represented the base price at mill plus the freight charges to destination; that all of the transactions with the railway company were handled in the same way as those with other consignees, who were required to pay the railway company full freight; that the regular form of commercial bill of lading was used in the shipments to the railway company f. o. b. carrier’s lines Alex
 
 *379
 
 andria, La.; that the lumber company was designated as the consignor or shipper and the plaintiff the consignee; that the destination of the shipments was Marshall, Tex.; that the bills of lading were not marked “freight pre-paid”; and that the plaintiff had the right of inspection and rejection of the lumber at Marshall, Tex.
 

 Plaintiff contends that under the clear and unambiguous provisions of the tariff, defendants were not entitled to credit for lumber which it purchased and shipped over its own lines, because the shipment was not at the full tariff rate applicable, since the railway company was exempt from the payment of any freight charges; that the bill of lading was a mere receipt for the merchandise bought; and that the railroad was in the same position as any other local purchaser who bought materials from the lumber company and used it at Alexandria.
 

 The defendants question the clearness of the tariff provisions in connection with “milling-in-transit” contracts, on the ground that the provisions of the tariff in this respect are silent with reference to a case where a railway company buys materials, and state that under the law the language of the tariff must be construed in favor of the shipper.
 

 Assuming that the tariffs are free from ambiguity, a view most favorable to the plaintiff, but without deciding that issue, let us consider the defenses raised in connection with the contracts of purchase of the materials by the railway company and the bills of lading under which the shipments were made. There is no doubt that the railway company was entitled to haul material which it purchased over its own lines without paying freight charges. It is also evident that the railway company had the right to assume those charges in connection with the purchase of the material to be shipped. It is conceded that the defendants are not liable for the outbound freight charges on this material. The only reason why the railway company did not charge itself freight was because under the tariffs it was exempt therefrom. If the railway company had charged itself the full tariff rate on the outbound shipments, it is, clear that the defendants would have been entitled to credit therefor on the “milling-in-transit” accounts. Of course, the railway company could refrain from making these entries on its books, if it elected to do so, but its failure to charge itself could not affect the rights of the defendant lumber company, if, in entering into the contracts of purchase of the lumber, it was contemplated by the parties that credit would be given the lumber company on the transit account for these shipments.
 

 The evidence is convincing that the lumber company predicated its based price f. o. b. mill Alexandria on the depressed tariff rate or 2 cents per hundredweight as against 8 cents per hundredweight normal tariff rate for the handling of the rough inbound materials. The prices quoted on all other f. o. b. purchases at Alexandria were
 
 *381
 
 the same as those that the railway company obtained. If the railway company had asked for bids on the basis of f. o. b. destination - or Marshall, Tex., the lumber company would have been required to add to its based f. o. b. mill price the freight charges, which are substantial. It appears to us that the railway company’s officials knew that the prices quoted to it were based upon the depressed tariff rate for the inbound shipments, because the bills of lading issued by the company in connection with the outbound shipments were identical with the regular commercial bills of lading where the consignee paid the full published tariff rate. These bills of lading were more than receipts for the lumber, as the plaintiff’s representatives had the right of inspection and rejection of the materials at destination, and because the lumber company’s right to claim credit for the shipments depended upon them.
 

 The argument that the plaintiff occupies the same position as a local purchaser who used the materials at Alexandria is unsound. Where lumber was sold f. o. b. Alexandria to a consignee at Marshall, Tex., the representatives of the lumber company knew that it would receive credit on the transit account therefor or, in other words, would not be liable for the difference between the high and low inbound tariff rates for rough materials, or 6 cents per hundredweight. But where it was sold locally to be used there, the representatives of the lumber company knew that it would not get credit for these materials on the transit account, because the materials were not reshipped and the lumber company would have to pay the difference between the high and low inbound tariff rate for the rough materials, or 6 cents per hundredweight. It follows that the lumber company had to charge more to local purchasers for local consumption than those who bought f. o. b. railway cars Alexandria for shipment elsewhere. Therefore, the two situations are not parallel.
 

 It is our opinion that the contracts of sale covering material sold to plaintiff f. o. b. company’s rails at Alexandria, and the regular commercial bills of lading under which the lumber was shipped, obligated the railroad company, as consignee, to pay the freight, or, at least, charge itself therefor, in order to give the defendants credit under the “milling-in-transit” agreements for these shipments.
 

 We conclude that the defenses sustained by the trial court were well founded, and the judgment is therefore affirmed.